Douglas R. Hart, SBN 115673
dhart@sidley.com
David R. Carpenter, SBN 230299
drcarpenter@sidley.com
Sheryl K. Horwitz, SBN 229115
shorwitz@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Attorneys for Defendant
LIBERTY MUTUAL MANAGED CARE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LYNN METROW, LINDA MASTIN, SHANAN WALI, and ROSE ANN GAINOR individually and on behalf of all others similarly situated,

Plaintiffs,

v.

LIBERTY MUTUAL MANAGED CARE LLC, and DOES 1 through 50, inclusive,

Defendants.

Lead Case No. 5:16-CV-01133 JGB (KK)

[Consolidated with Case No. 16-cv-02018-JGB-KK]

Assigned to: Hon. Jesus G. Bernal

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF GAINOR'S MOTION FOR CLASS CERTIFICATION**

[Declarations and supporting evidence filed under separate cover]

Hearing Date: May 1, 2017
Hearing Time: 9:00 A.M.

Complaint Filed: February 24, 2016

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

- A. Overview of the NCM Role and Summary Job Description ........ 3
- B. Testimony Regarding NCMs' Case Management Duties ........ 5
- C. Other Factors Affecting a Given NCM's Actual Duties ........ 7
- D. Additional Facts Specific to Plaintiff Gainor ........ 11

III. LEGAL STANDARDS ........ 12

- A. Class Certification Standards ........ 12
- B. Underlying Substantive Law ........ 13

IV. ARGUMENT ........ 16

- A. Plaintiff's Motion Relies on the False Premise that Nurse Case Managers Are Categorically Non-Exempt ........ 16
- B. Plaintiff Cannot Establish Predominance Because She Does Not Offer any Form of Common Proof to Adjudicate the Claims Without Devolving into Individual Inquiries ........ 19
- C. Gainor Is Not a Typical or Adequate Class Representative ........ 24

V. CONCLUSION ........ 25




ACTIVE 220047600v.9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aburto v. Verizon Cal.*,
No. CV-11-03683, 2012 WL 10381 (C.D. Cal. Jan. 3, 2012) ....... 20

*Bothell v. Phase Metrics, Inc.*,
299 F.3d 1120 (9th Cir. 2002) ....... 17

*Brady v. Deloitte & Touche LLP*,
No. CV-08-00177, 2012 WL 1059694 (N.D. Cal. Mar. 27, 2012),
*aff'd* 587 Fed. Appx. 363 (9th Cir. 2014) ....... 18, 20

*Brady v. Deloitte & Touche LLP*,
No. CV-08-00177, 2015 WL 11109830 (N.D. Cal. Sept. 4, 2015) ....... 19

*Bratt v. County of Los Angeles*,
912 F.2d 1066 (9th Cir.1990) ....... 17

*Braun v. Safeco Ins. Co.*,
No. CV 13-00607, 2014 WL 9883831 (C.D. Cal. Nov. 7, 2014) ....... 22

*Bucklin v. Am. Zurich Ins. Co.*,
619 Fed. Appx. 574 (9th Cir. 2015) ....... 18, 21

*Cheatham v. Allstate Ins. Co.*,
465 F.3d 578 (5th Cir. 2006) ....... 18

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ....... 25

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ....... 13

*Dobrosky v. Arthur J. Gallagher Serv. Co. LLC*,
No. 13-cv-00646, 2014 WL 10988092 (C.D. Cal. July 30, 2014) ....... 21, 22

*Dunbar v. Albertson's, Inc.*,
141 Cal. App. 4th 1422 (2006) ....... 13

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ....... 12, 14

*In re Farmers Ins. Exch.*,
481 F.3d 1119 (9th Cir. 2006) .......... 21

*Gales v. Winco Food*,
No. C-09-05813, 2011 WL 3794887 (N.D. Cal. Aug. 26, 2011) .......... 20

*Hamilton v. Genesis Logistics, Inc.*,
No. CV13-01848, 2014 WL 4187941 (C.D. Cal. Aug. 22, 2014) .......... 20

*Hanon v. Dataprods. Corp.*,
976 F.2d 497 (9th Cir. 1992) .......... 13, 25

*Harris v. Superior Court*,
53 Cal. 4th 170 (2011) .......... 1, 15, 17

*Jovel v. Boiron, Inc.*,
No. 11-cv-10803, 2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) .......... 25

*Marlo v. United Parcel Serv., Inc.*,
251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) .......... 22

*Marlo v. United Parcel Serv., Inc.*,
639 F.3d 942 (9th Cir. 2011) .......... *passim*

*Mies v. Sephora USA Inc.*,
234 Cal. App. 4th 967 (2015) .......... 17

*Pedroza v. Petsmart, Inc.*,
No. 11-cv-00289, 2013 WL 1490667 (C.D. Cal. Jan. 28, 2013) .......... 23

*Rieve v. Coventry Health Care, Inc.*,
870 F. Supp. 2d. 856 (C.D. Cal. 2012) .......... 1, 16, 17, 18

*Rosenberg v. Renal Advantage, Inc.*,
No 11-CV-2152 2013 WL 3205426 (S.D. Cal. June 24, 2013) .......... 20

*Soderstedt v. CBIZ S. Cal., LLC*,
197 Cal. App. 4th 133 (2011) .......... 19

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (2009) .......... 13

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 12, 14

*Weigele v. FedEx Ground Package Sys., Inc.*,
267 F.R.D. 614 (S.D. Cal. 2010) .......... 14

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) .......... 13

*Williams v. Lockheed Martin Corp.*,
No. 09-CV-1669, 2011 WL 2200631 (S.D. Cal. June 2, 2011) .......... 20

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) .......... 13

**Statutes and Regulations**

29 C.F.R. § 541.205 (2000) .......... *passim*

29 C.F.R. § 541.207 (2000)(d) .......... 17, 18

Cal. Admin. Code § 11040(1)(A)(2) .......... 14

# I. INTRODUCTION

When an employee is injured on the job, the employee, the employer, and the workers' compensation insurer all have an interest in ensuring that the employee receives appropriate care and returns to work in a safe and timely manner. While claims adjusters are primarily responsible for the claims, they often lack the medical expertise to manage the medical and disability issues relating to the claim. That is why Liberty Mutual Managed Care LLC ("Liberty Mutual") employs licensed registered nurses as Nurse Case Managers ("NCMs").

Generally, the role of an NCM is to assess the prescribed medical treatment and develop return to work strategies. NCMs are expected to use their clinical judgment to analyze diagnoses, identify gaps in treatment, and make recommendations that, consistent with the best interests of the patient, would be more cost-effective and help the employee return to work faster. NCMs may also consult with employers on duty modifications and advise claims adjusters on issues such as causality, loss cost estimates, and authorization of benefits. In these ways, NCMs improve outcomes and generate significant cost savings for Liberty Mutual and its customers.

In moving for class certification, Plaintiff Rose Ann Gainor ("Plaintiff" or "Gainor") alleges that NCMs' duties are closely prescribed, such that NCMs have been misclassified under California law. But her motion relies on a false legal premise, *i.e.*, that the NCM role is categorically non-exempt under *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d. 856 (C.D. Cal. 2012). The California Supreme Court has specifically rejected the notion, presented in *Rieve* and in Plaintiff's motion, that only an adviser "at the level of policy or general business operations" can meet the administrative exemption. *Harris v. Superior Court*, 53 Cal. 4th 170, 188 (2011). To the extent an NCM can alter the trajectory of care and achieve significant cost-savings through planning, negotiation, and critical judgment, that work qualifies for exemption. That inquiry requires an analysis of an NCM's actual day-to-day work.

Once that false legal premise is eliminated, Plaintiff cannot satisfy the predominance and superiority requirements for certification because she presents no form of common proof that, at trial, could substantiate Plaintiff's characterization of the NCMs' actual duties without devolving into individual inquiries. As a matter of law, the fact that NCMs use high-level guidelines and protocols does not preclude exempt work. While Plaintiff characterizes her role as mostly documenting information, another putative class member, Pamela Silver – whose declaration is being submitted in opposition to class certification – explains that she can affect the trajectory of care in various ways and frequently makes recommendations that are accepted by others. The evidence also reflects that NCMs' actual duties can vary depending on their specific assignments, customers, and cases. Ultimately, there is no way to determine how each NCM actually carries out his or her duties without individualized inquiry. Moreover, Plaintiff cannot establish predominance through her expert's analysis of data regarding the task codes used by NCMs to bill their time because, among other things, the billing records show substantial variation in the proportion of time spent by different NCMs on their respective mixes of tasks.

Independently, Plaintiff Gainor is not a typical or adequate representative. Conflicts between her allegations about her work and her performance reviews call into question her credibility and demonstrate the need for individualized cross-examination. The billing records and other evidence also show that Gainor is an outlier whose experiences are not representative of the class as a whole.

Accordingly, Plaintiff's motion for class certification should be denied.

## II. BACKGROUND

This action has been brought by Plaintiffs Lynn Metrow, Linda Mastin, Rose Ann Gainor, and Shanan Wali. Gainor and Wali were "Telephonic" Nurse Case Managers who worked remotely, while Metrow and Mastin were "Field Nurse Case Managers" who received assignments to meet with medical providers and claimants on-site. Declaration of Cynthia Tanriverdi ("Tanriverdi Decl.") ¶ 20. On February 6,

2016, Plaintiff Gainor filed a motion to certify a statewide class of *only* telephonic case managers, with her as the sole class representative. In support of her Motion, she proffered a declaration from herself, as well as exhibits attached through a declaration from her attorneys. Wali, despite being a named plaintiff, did not join in the Motion and did not provide a declaration. Plaintiff's moving papers included a declaration from another putative class member, Heidi Alto, but Plaintiff has since withdrawn that declaration and agreed not to rely on it. Def. Ex. A.[1]

The following sets forth the facts based on evidence presented by Plaintiff for the Motion and by Defendant in opposition.

**A. Overview of the NCM Role and Summary Job Description**

Under California's workers' compensation system, employees who are injured on the job are entitled to coverage for appropriate treatment as well as compensation for time off work while they recover. Ancillary to its sale of insurance policies, Liberty Mutual employs various people engaged in claims management. Tanriverdi Decl. ¶ 3. Liberty Mutual and its customers have strong financial interests in ensuring that the treatment provided is not only medically appropriate, but also that it is cost-effective and helps the employee return to work in a timely manner. *Id.*

As part of the claims management process, Liberty Mutual employs claims adjusters who are involved in investigating and determining coverage, setting reserves, and settling the claims. Pl. Ex. 2, at 21. Depending on the case, however, claims adjusters may lack the medical expertise to evaluate the prescribed course of medical treatment. Tanriverdi Decl. ¶ 4. Thus, in appropriate cases, claims adjusters refer claims to "Medical & Disability Nurse Case Managers" or "Senior Medical & Disability Nurse Case Managers," also known as Nurse Case Managers or "NCMs." *Id.* For these positions, Liberty Mutual hires registered nurses with at least three

---

[1] "Def. Ex." refers to exhibits to the Declaration of Sheryl Horwitz in Opposition to Plaintiff's Motion for Class Certification. "Pl. Ex." refers to the exhibits attached to the Declaration of Aparajit Bhomik in support of Plaintiff's Motion.

years' clinical experience. *Id.* ¶ 6. Putative class members were paid at least $70,000 a year. *Id.*; Gainor Decl. Ex. 4; Gainor Dep. 130:14-18, Ex. 11.

The high-level job description states that the NCM is "responsible for medically managing assigned caseload and by applying clinical expertise to ensure individuals receive appropriate healthcare in order to return to work and normal activity in a timely and cost effective manner." Pl. Ex. 5, at LMMC007626. Key responsibilities include, among other things, that NCMs effectively communicate "with claimants, medical professionals, claims staff, attorneys and others to obtain information, and **to negotiate medical treatment and return to work plans using critical thinking skills, clinical expertise and other resources as needed to achieve optimal case outcome**." *Id.* (emphasis added). The summary of key qualities includes, among other things: "[a]bility to analyze, apply clinical expertise and make sound nursing judgments," and "[g]ood negotiation skills to effectively establish target return to work dates and coordinate medical care." *Id.* at LMMC007628. The job description states, however, that it only describes "*the general nature*" of the work. *Id.*

As Plaintiff Gainor concedes, workers being out of work and on leave has significant economic impact on employers. Def. Ex. B, Deposition of Rose Ann Gainor ("Gainor Dep.") 9:17-10:22. Effective case management by a nurse thus can improve patient outcomes and generate significant cost savings on treatments and by reducing the time off work. *Id.*; *see* Tanriverdi Decl. ¶¶ 3-5. Helmsman Management Services LLC – an affiliate of Liberty Mutual – recently analyzed a large sample of Liberty Mutual's national insurance, business insurance, and Helmsman claims and found that nurses add significant value to the claims they work on, resulting in 18% lower future medical costs, 26% lower overall costs, and 15% faster claims closure (return to work). Tanriverdi Decl. ¶ 5 & Ex. A. The resulting white paper credited, among other things, "[e]ffective problem-solving" and strong communication skills as key drivers in nurses' ability to achieve such cost savings and better outcomes. *Id.* For many businesses, large and small, workers' compensation is a significant cost

center. *Id.* The ability of an NCM to reduce overall costs by 26% over the course of her caseload reflects a potential for significant savings to the customer's business as a whole, as well as to Liberty Mutual's workers' compensation business. *Id.*

**B. Testimony Regarding NCMs' Case Management Duties**

NCMs do not provide direct patient care as they would if they were practicing in a clinical setting. Declaration of Pamela Silvers ("Silvers Decl.") ¶ 3; Gainor Dep. 25:5-7. NCMs, however, are expected to use their clinical judgment to evaluate and negotiate a medical treatment plan to promote the safe and timely return to work. Tanriverdi Decl. ¶¶ 6-11; Silvers Decl. ¶ 5.

*Evaluating the Mechanism of Injury and Advising the Claims Adjuster*. An initial aspect of medical management involves assessing the diagnosis to ensure that it matches the mechanism of injury. The time spent on this task will vary substantially depending on the circumstances of a given case. Tanriverdi Decl. ¶ 8. While the claims adjuster is ultimately responsible for coverage determinations, the NCM often acts as a critical resource on complex medical causality questions beyond the claims adjuster's expertise. Depending on the case, NCMs may also advise the claims adjuster in setting the reserve (providing the "loss cost estimate"). Tanriverdi Decl. ¶ 8; Def. Ex. C., Deposition of Linda Mastin ("Mastin Dep.") 124:7-125:4. They may also recommend that the claims adjuster approve additional benefits (e.g., additional therapies) that the NCM believes will facilitate recovery. Tanriverdi Decl. ¶ 8.

*Evaluating the Treatment Plan*. In addition, NCMs are expected to analyze treatment plans for "root causes in delays in recovery" and barriers to return to work. Gainor Dep. 9:1-10:22; Silvers Decl. ¶ 3; Tanriverdi Decl. ¶ 9. In this role, NCMs are expected to use their clinical judgment and experience to determine whether they agree with the physicians' treatment plans, including identifying cases of under-treatment or overtreatment. Gainor Dep. 28:7-29:9; Silvers Decl. ¶ 3; Tanriverdi Decl. ¶ 9. NCMs are expected to identify when a treatment plan deviates from standard treatment guidelines and to determine, in those instances, whether the

deviation is appropriate. *Id.* NCMs can also identify gaps in care or "comorbid" conditions (unrelated conditions that may impact recovery) that the physician may have missed. *See* Silvers Decl. ¶¶ 4-5; Tanriverdi Decl. ¶¶ 6, 9.

*Promoting Cost-Effective Treatment*. NCMs also can perform an important cost-control check on the choice of treatments. Tanriverdi Decl. ¶ 10. This may include, for example, directing the employee to in-network providers, identifying cases of overtreatment, or identifying cases where an alternative, equally effective yet cheaper therapy is available (such as with prescription drugs). *Id*.

*Facilitating Return-to-Work*. NCMs particularly add value in facilitating timely return-to-work. Tanriverdi Decl. ¶ 11. While doctors determine a patient's abilities and limitations, the NCM has unique insight into the specific job duties required by the employer (Liberty Mutual's customer) and what modified duties may or may not be available. For example, if the employee's job requires strenuous physical activity, and the NCM believes that certain additional therapies would be helpful, the NCM can recommend those to the provider. *Id*.; Silvers Decl. ¶ 7. As another example, the NCM may find that the limitations set by a provider on the employee's work duties (such as how much the employee can lift) have become outdated in light of the employee's improved condition, or otherwise are unduly restrictive and would unnecessarily preclude the employee from returning to work. Tanriverdi Decl. ¶ 11. In such cases, the NCM can recommend to the provider that the limitations be modified to better fit the employee's current abilities and facilitate his or her return to work. *Id*. If it appears that an employee will not be able to return to work at all, then the NCM is responsible for facilitating resolution of the claim by having the provider put the employee on "P&S" (permanent and stable) status. *Id.*

NCMs are responsible for developing their own plan and strategy for managing the case, including by coordinating with medical providers, injured employees, claims adjusters, employers, and others. Tanriverdi Decl. ¶ 9; Pl. Ex. 2 (Tanriverdi Dep.) at 30:3-31:23. As reflected above, NCMs can make recommendations directly to a

medical provider for changes to the treatment plan. If the provider disagrees, the NCM can decide to engage others, such as Liberty Mutual's Regional Medical Director and/or the claims adjuster, to help effect the change. Tanriverdi Decl. ¶ 9; Silver Decl. ¶¶ 4-8, 12. In these ways, "[n]urses have a great opportunity to change the trajectory of care." Tanriverdi Dep. 33:13-15.

The ways in which NCMs actually carry out these duties, however, may vary. For example, Gainor characterized her duties primarily as obtaining information for others. Gainor Dep. 8:3-17. She claims that she was not allowed to engage any resource, including Liberty Mutual's Regional Medical Director ("Dr. Gean"), unless she received prior permission from the claims adjuster, and that even when she engages Dr. Gean, she never gave him any recommendations. *Id.* at 43:17-22, 66:4-7. Pamela Silvers, in contrast, describes her duties as developing strategies that influence treatment plans and facilitate resolution of the claim in various ways. Silvers Decl. ¶¶ 3-8, 12. She states that she did not need prior approval before engaging Dr. Gean, that she provided Dr. Gean specific recommendations for action, and that Dr. Gean agreed with her recommendations 95% of the time. *Id.* ¶¶ 5, 7. Thus, even on the basic question of whether the NCM is able to take "any real action on the files referred to them" (Pl. Mem. 9), Gainor and Silvers paint materially different pictures.

### C. Other Factors Affecting a Given NCM's Actual Duties

Plaintiff's Motion alleges that NCMs work "on a virtual assembly line" under uniform, closely prescribed procedures. *E.g.*, Pl. Mem. 6-8. In reality, the specific activities involved in any given claim vary depending a number of factors, including for example: the specific circumstances of the claim; when in the process the NCM receives the referral; who the customer is; and the individual NCMs' personal interactions with the various parties with whom he or she interacts. Tanriverdi Decl. ¶ 12. In addition, the policies and procedures alleged do not dictate the substance of the NCM's analytical work or themselves can vary.

### 1. Variation in the Scope and Nature of Assignments

NCMs can perform different tasks depending on when they become involved in the case. Tanriverdi Decl. ¶ 13. When engaged early on, the NCM may be expected to be especially proactive in setting initial case strategy for the treatment plan and return to work. *Id.*; Silvers Decl. ¶ 4. In other situations, an NCM may be engaged only after there has been a delay in the employee's return to work, and the NCM's job is to determine what the problem is and devise a solution. Tanriverdi Decl. ¶ 13; Silvers Decl. ¶ 12. In yet other cases, NCMs may be tasked with only a limited assignment (*e.g.*, to review a particular medication decision). Tanriverdi Decl. ¶ 13.

The referral criteria for engaging an NCM have varied over time and across business lines. For example, from 2013-2015, certain lines had a program generally emphasizing early engagement, while other business lines have had more targeted triggers. Tanriverdi Decl. ¶ 13; Silvers Decl. ¶ 12.

Silvers explained that, while there are guidelines for the anticipated duration of an assignment, she partners with claims adjusters to decide whether to continue an engagement beyond the expected duration in appropriate cases (or conversely, when the situation has stabilized and is appropriate for her disengage). Silvers Decl. ¶ 14. Silvers cannot recall any time in which she sought to remain on a case beyond the guidelines but was denied the opportunity. *Id.*

The specific work performed on a given claim is also affected by the customer. Some customers have special service instructions ("SSIs"), and certain NCMs are dedicated to particular accounts. Tanriverdi Decl. ¶ 14. For example, one of Liberty Mutual's largest accounts in California has its own criteria for early, proactive NCM engagement with an emphasis on return-to-work planning. *Id.* As another example, Plaintiff Gainor spent most of her time as the Senior Nurse dedicated to one account with its own SSIs; she had a heightened responsibility for meeting the particular service expectations of that customer. *See* Tanriverdi Decl. ¶ 18. At one point in time, Plaintiff was on a different, "huge account" that was "very special." Gainor

Dep. 37:14-18. Gainor explained that, "They don't give that to anybody," *id.*, thus acknowledging the significance of her assignment and that NCMs can add different levels of value depending on their skills and experience. Tanriverdi Decl. ¶ 6.

The nature of a customer's business may also affect return-to-work planning. A critical aspect of an NCM's job is negotiating or coordinating with the employer about potential modifications the employees' job duties to facilitate their return to work. Tanriverdi Decl. ¶ 15. Gainor admitted that, in negotiating a return-to-work strategy, "You have to be creative and come up with something if they want him transitioning back." Gainor Dep. 72:23-73:8. In some contexts, NCMs have broad discretion to work with the employer to create transitional "light" duties that may even involve, for example, temporarily placing the employee at a non-profit organization. Tanriverdi Decl. ¶ 15. Other customers, however, are far more restricted in the light-duty work they are willing to provide or can provide (due to union contracts, for example). *Id.*

Liberty Mutual's expert has analyzed billing-record data cited in Plaintiff's Motion, and that data, in fact, shows significant variation in (i) the amount of time NCMs spend on different tasks, (ii) the nature of individual claims, and (iii) the total hours worked per day. *See* Declaration of Robert Crandall ("Crandall Decl.") ¶¶ 7-8. The average amount of time that NCMs spend on different tasks varies significantly from person to person, and Gainor is an outlier across numerous metrics – for example, she spends significantly more time on her initial case assessments than most other NCMs. *Id.* ¶¶ 9-23 & chts. 1-5. The data also shows that claims vary in complexity and duration and can involve a significantly different mix of tasks and significantly different proportions of time spent on those tasks. *Id.* ¶¶ 24-30 & chts. 6-7. There is also substantial variation person to person in the average number of claims per day that NCMs work, and for each NCM, there is significant variation in how many claims that individual may touch on any given day. *Id.* ¶ 34 & cht. 10.

**2. Evidence Related to Other Policy and Procedures**

Plaintiff's Motion refers to other alleged procedures and guidelines, but they do

not show that NCMs work in uniform, "factory-like conditions." Pl. Mem. 7.

*The Use of Evidence-Based Medicine and Clinical Guidelines*. Like most professionals, NCMs refer to protocols and guidelines in their work. For NCMs, these include clinical reference works and the general principle that treatments should be supported by evidence that they are likely to work. Tanriverdi Decl. ¶ 12. Gainor acknowledges that every case is different, and that the NCM must use his or her judgment and clinical experience to determine the proper course of treatment based on the facts of a particular case. Gainor Dep. 16:13-17, 29:15-25, 41:7-13. Declarant Silvers states that she is empowered to use her medical judgment to deviate from medical treatment guidelines in appropriate cases. Silvers Decl. ¶ 10.

*Use of the ExPRS computer system*. Most NCMs use the "ExPRS" software, but it is simply a tool to document their case notes and activities. Tanriverdi Decl. ¶ 12. It does not dictate the decisions that NCMs make in a case. Silvers Decl. ¶ 9.

*Utilization Review*. Utilization Management ("UM") review is a step in the workers' compensation process in which certain medical procedures must be reviewed for medical necessity. Tanriverdi Decl. ¶ 16; Silvers Decl. ¶ 10. These procedures include diagnostic testing, surgery, in-patient hospitalization, physical therapy, and chiropractic care. *Id*. UM review is done by UM nurses whose review of the file is limited to reviewing the need for a particular procedure. Their work is separate from NCMs who are more actively engaged with provider(s), claims adjusters, and employees in the overall course of treatment and return-to-work plans. Tanriverdi Decl. ¶ 16. Whether UM review applies to a given claim, however, varies. *Id.*; Silvers Decl. ¶¶ 10-11. UM review is required by law in certain states, including California, but not in others, and some NCMs spend significant amounts of time on out-of-state cases where UM review does not apply. Silvers Decl. ¶¶ 10-11; Tanriverdi Decl. ¶ 16. NCMs may also get involved in a case at different points in the process, meaning that in many cases they become involved only after UM review has


ACTIVE 220047600v.9

been completed. *Id.*; Silvers Decl. ¶ 11. Other times, NCMs are brought in to second-guess, or may have the authority to deviate from, a UM decision. *Id.*

*Utilization of Other Resources.* One aspect of the NCM job is determining when to utilize additional resources. Tanriverdi Decl. ¶ 17. For example, telephonic NCMs – like Gainor – work remotely, and if they need someone to meet in person with the employee or provider, they can engage a field nurse case manager. *Id*. Gainor says she had to obtain prior approval before engaging any outside resource. Gainor Dep. 66:4-14. That it is not uniform requirement. Tanriverdi Decl. ¶ 17.

### D. Additional Facts Specific to Plaintiff Gainor

Plaintiff Gainor was employed as a Senior NCM from 2012 until she resigned in 2015. Tanriverdi Decl. ¶ 19. Her performance reviews generally describe her as a solid performer and contradict the notion that her duties were purely clerical or closely prescribed. *Id*. For example, her 2013 review stated that she "demonstrated the ability to provide independent management of complex cases." Gainor Dep. 136:11-17, Ex. 14, at 7. Her 2014 review described her as "a strong nurse case manager, analyzing cases for root causes to delays in recovery and putting together specific strategies to address the concerns while facilitating case resolution." Gainor Dep. 143:6-12, Ex. 15, at 2. Her 2015 interim review reveals that she "innovatively addresses RTW barriers & works a challenging account where there are limited modified duty options … putting more responsibility on the NCM which Rose handles well." *Id.* at 143:6-144:9, Ex. 16, at 4.

Her work was subject to quality assurance ("QA") metrics, but those QA scores reflect expectations for strategic and proactive thinking. Tanriverdi Decl. ¶ 19. For example, her 2013 review reflects that she "identifies red/yellow flags but needs to develop strategies to mitigate the impact to the file both during the initial evaluation strategy and ongoing." Gainor Dep. Ex. 14, at 4; *see also id.* at 4-5 ("missed opportunities for applying critical thinking and forming a strategy").

One area of concern in her performance reviews was her communication style,

which led to a performance warning in 2014. Gainor Dep. 95:5-96:6, Ex. 9. There had been "ongoing communication issues and less than favorable response to [her] communication style," including perceptions that she was "demeaning, abrupt and rude." *Id*. In deposition, however, Plaintiff disputed whether the incident truly arose out of her unprofessional communication style and claimed that, instead, it reflected the limit scope of her decision-making authority. Gainor Dep. 93:3-96:18.

Gainor's story about why she left Liberty Mutual also involves facts unique to her. According to Gainor's declaration and deposition testimony, her manager began demanding frequent after-hours conference calls, and it got to the point that Gainor "suffered a nervous breakdown" and abruptly resigned. Gainor Decl. ¶ 11. Gainor does not allege that these particular interactions with her manager arose from Liberty Mutual policy or are representative of any other employees' experiences.

## III. LEGAL STANDARDS

### A. Class Certification Standards

To certify a class, Plaintiff must meet the requirement of Rule 23 of the Federal Rules of Civil Procedure, including the Rule 23(a) elements – numerosity, commonality, typicality, and adequacy – and Rule 23(b)(3)'s requirements that (1) common questions of law and fact predominate, and that (2) a class action is superior to other means for fairly and efficiently adjudicating the controversy. It is Plaintiff's burden to show these requirement are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). "Rule 23 does not set forth a mere pleading standard" and instead requires a "rigorous analysis." *Wal-Mart*, 564 U.S. at 350-51. "Commonality" requires an issue in which the "determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Rule 23(b)(3)'s predominance inquiry is "even more demanding," and will not be satisfied if individual issues "will inevitably overwhelm questions common to class." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432-33 (2013).

For the predominance inquiry, courts first examine the substantive issues raised by plaintiffs and, second, inquire into the proof relevant to each issue. *See Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508-09 (9th Cir. 1992). For overtime misclassification cases, Plaintiffs must show how, under the applicable exemptions, "common proof" could obviate the need for individualized inquiries into employees' actual work duties and how they spend their time. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011). Under California law, exempt status is determined "week-by-week" based on the work actually performed. *Id.* (affirming decertification based on need for week-by-week analysis); *Dunbar v. Albertson's, Inc.*, 141 Cal. App. 4th 1422 (2006) (denying class certification).

The mere fact that putative class members share a job title or uniform job classification is not dispositive because it "does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009). Predominance will fail when trial will require "an individualized inquiry into the manner in which each [plaintiff] actually carried out his or her work," notwithstanding "the presence of other issues susceptible to common proof." *Vinole v. Countrywide Home Loans Inc.*, 571 F.3d 935, 944, 46-48 (2009).

Likewise, superiority requires that a class trial be efficient and manageable and consistent with due process. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-93 (9th Cir. 2001). "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Id.* at 1192. "[A] class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart*, 564 U.S. at 367; *see also Weigele v. FedEx Ground Package Sys., Inc.*, 267 F.R.D. 614, 623-24 (S.D. Cal. 2010) (decertifying class).

### B. Underlying Substantive Law

Plaintiff does not need to show that she will prevail on the merits to obtain class

certification. "Frequently," however, the rigorous analysis required at the class certification stage "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. "[I]t is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap" with the Rule 23 requirements. *Ellis*, 657 F.3d at 981. Accordingly, some background regarding the underlying exemptions is necessary and appropriate. *See Marlo*, 639 F.3d at 948-49 (finding it proper for district court to evaluate whether cited evidence could support classwide finding on administrative exemption).

A key issue here is whether Liberty Mutual telephonic NCMs are exempt under the administrative exemption, which applies when the employee: (1) has duties involving "[t]he performance of office or non-manual work directly related to management policies or general business operations," (2) customarily and regularly exercises discretion and independent judgment; (3) is primarily engaged in performing exempt duties; and (4) meets the salary-basis test. Wage Order No. 4-2001, *codified at* 8 Cal. Admin. Code § 11040(1)(A)(2). The Wage Order expressly incorporates certain federal regulations effective as of the date of the order. § 11040(1)(A)(2)(f).

Those incorporated regulations include, among others, 29 C.F.R. § 541.205 (2000), which defines work "directly related to management policies or general business operations" as work "relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work." 29 C.F.R. § 541.205(a). The administrative operations may be that of the employer or its customers. 29 C.F.R. § 541.205(a), (d).

As the California Supreme Court explained in *Harris v. Superior Court*, 53 Cal. 4th 170 (2011), to meet the "directly related" element, an employee's work must be "qualitatively" administrative in nature. *Id.* at 181-82. "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning,

negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b).

In addition, the work "quantitatively" must be of "substantial importance to the management or operation of the business of his employer or his employer's customers." *Harris*, 53 Cal. 4th at 181-82 (citing § 541.205(a)). As the regulations explain:

> Employees whose work is 'directly related' to management policies or to general business operations include those whose work affects policy **or whose responsibility it is to execute or carry it out**. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, **or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business**.

29 C.F.R. § 541.205(c) (emphasis added). In *Harris*, the Court explained that the exemption criteria cannot be interpreted "categorically" and instead "courts must consider the particular facts before them and apply the language of the statutes and wage orders at issue." *Harris*, 53 Cal. 4th at 176, 190.

Under the plain language of these regulations, NCMs' duties qualitatively involve "servicing" the business of Liberty Mutual and its customers by, among other things, "planning" return-to-work strategies, "negotiating" with providers and employers, and performing a business "control" function as to the appropriateness and cost-effectiveness of care. 29 C.F.R. § 541.205(b). Quantitatively, a given NCM is at least potentially exempt depending on the extent to which he or she is able to affect the trajectory of treatment plans and get employees back to faster, and thus generate significant savings for the customer and/or Liberty Mutual within that segment of the business. *See* Tanriverdi Decl. ¶ 5 & Ex. 1 (noting that NCMs, through effective planning, communication, and critical thinking, can shorten time off work and reduce overall claim costs by 26%). If, however, an NCM's duties are primarily routine and "clerical" – *e.g.*, they simply involve providing information to others – then the NCM would be non-exempt. *See* 29 C.F.R. § 541.205(c)(1).

## IV. ARGUMENT

Plaintiff's Motion principally relies on the assertion that, although NCMs make recommendations, they do not supervise other employees and cannot take binding "affirmative action" to override a doctor's diagnosis or decide what benefits are allowed. Pl. Mem. 2, 9-10. Citing *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d. 856 (C.D. Cal. 2012), Plaintiff thus argues that all NCMs are categorically non-exempt under California law. Indeed, Plaintiff's Motion describes the entirety of her "trial plan" as relying on this construct. *See* Pl. Mem. 2. Part A below explains why *Rieve* is not persuasive and that Plaintiff's theory of class certification and "trial plan" are based on a false legal premise. Part B explains why, under the proper legal framework, Plaintiff lacks any form of common proof that would enable her to adjudicate liability without individual inquiries overwhelming the trial. Part C explains why Plaintiff Gainor is not a typical or adequate class representative.[2]

### A. Plaintiff's Motion Relies on the False Premise that Nurse Case Managers Are Categorically Non-Exempt

Plaintiff's Motion substantially relies on *Rieve*, which misinterpreted California's administrative exemption as requiring "that the employee in question must hold a supervisory position" or be a "high level advisor … [who] directly interacts with upper management." *Rieve*, 870 F. Supp. 2d at 873. *Rieve* found a nurse case manager to be non-exempt because, although she provided recommendations about treatment plans, she lacked the power to "take affirmative action that would bind anyone other than herself" and her advice was provided "at the individual level" rather than to "upper management about policy decisions." *Id.* at 874-75. For several reasons, *Rieve* is not persuasive, and Plaintiff's "trial plan" is

[2] *Rieve* also held that, although plaintiff was exempt under the federal "professional" exemption, California's version of the professional exemption did not apply because it excludes "registered nurses employed to engage in the practice of nursing." *Rieve*, 870 F. Supp. 2d at 866-67. Nonetheless, Liberty Mutual reserves its right to assert the professional exemption as a defense in this case.

premised on a misstatement of the applicable law.

First, *Rieve* fails to heed the California Supreme Court's instruction in *Harris* that courts should apply "the language of the relevant wage order and regulations" rather than creating their "own gloss." *Harris*, 53 Cal. 4th at 188. *Harris* specifically considered and rejected the "gloss" that an employee, to be exempt, must be working "at the level of policy or general business operations" rather than handling cases on an individual level. *See Harris*, 53 Cal. 4th at 187-89. That notion is also refuted by the regulations themselves. *See* 29 C.F.R. § 541.205(c) ("[T]he phrase 'directly related to management policies or general business operations' is *not* limited to persons who participate in the formulation of management policies or in the operation of the business as a whole." (emphasis added)); 29 C.F.R. § 541.207(d) (2000) (regulations "do not require the exercise of discretion and independent judgment as at so high a level").[3] Moreover, nothing in the regulation states that supervising others is typically required; rather, it is the executive exemption that requires managerial and supervisory authority. *See Mies v. Sephora USA Inc.*, 234 Cal. App. 4th 967, 976-77 (2015).

Second, it is contrary to the plain language of the regulation that employees cannot be exempt unless they can take "affirmative action" that "binds" others. The regulation expressly provides that decisions made by the employee need not have "finality" and "may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.207(e).[4] If the NCM is able to alter the trajectory of treatment, get employees back to work faster, and achieve significant cost savings

---

[3] Plaintiff cites *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002), to argue that the exemption refers to "running the business itself or determining its overall course or policies." That quotation comes from *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir.1990). *Harris* questioned the persuasiveness of *Bratt* while rejecting such a categorical rule. *Harris*, 53 Cal. 4th at 188-89 & n.8.

[4] Section 541.207 specifically addresses the "discretion and independent judgment" prong, but the regulations must be read as whole to give effect to their express provisions and avoid rendering any provision superfluous. It would make no sense for § 541.207(e) to provide expressly that finality of decision is not required if such finality were, in fact, implicitly required by other aspects of the regulation.

for a segment of Liberty Mutual's and its customers' business, it does not matter that the NCM achieves those results through the power of effective communication, negotiation, and sound analysis, as opposed to unilateral decision-making. What matters is that the NCM is exercising critical judgment – rather than doing merely routine clerical work – thereby optimizing results and/or achieving cost-efficiencies for Liberty Mutual and its customers. *See, e.g.*, Tanriverdi Decl. ¶ 5 & Ex. A.

Third, the gloss provided by *Rieve* is contrary to other case law. For example, after *Rieve* was decided, the Ninth Circuit held that claims adjusters qualified for the administrative exemption under California law, even though the claims adjusters did not supervise anyone and did not set policy or advise upper-level management. *See Bucklin v. Am. Zurich Ins. Co.*, 619 Fed. Appx. 574 (9th Cir. 2015); *see also id.* at 576-77 (indicating that adjusters are engaged in exempt work even when their work consists of making recommendations to their supervisors); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585-86 (5th Cir. 2006) (exempt work "may consist of recommendations for action rather than the actual taking of action" (quotation omitted)). Likewise, unlicensed "junior" accountants working on large auditing teams have been found eligible for the administrative exemption, even through they do not have final decisionmaking authority but instead "bring 'significant accounting and auditing' questions to the attention of the audit partner or other management." *Brady v. Deloitte & Touche LLP*, No. CV-08-00177, 2012 WL 1059694, at *8 (N.D. Cal. Mar. 27, 2012) (holding that such facts did not render unlicensed accountants categorically non-exempt, and thus denying class certification based on lack of predominance), *aff'd* 587 Fed. Appx. 363 (9th Cir. 2014); *see also, e.g.*, *Brady v. Deloitte & Touche LLP*, No. CV-08-00177, 2015 WL 11109830 (N.D. Cal. Sept. 4, 2015) (denying renewed request for class certification); *Soderstedt v. CBIZ S. Cal., LLC*, 197 Cal. App. 4th 133, 140, 146-148 (2011) (denying class certification of low-level accountant associates based on need for individualized inquiries into actual work

duties under the administrative exemption). The above cases all would have been decided differently if *Rieve*'s gloss on the administrative exemption were correct.

For purposes of the present Motion, the Court does not need to resolve the merits of whether NCMs are or are not exempt. Rather, the point is that adjudicating exempt status requires an examination of NCMs' actual day-to-day work, as opposed to applying *Rieve*'s improper test. If the NCM can, as a matter of regular practice, improve patient outcomes and achieve substantial savings, that would tend to support a finding that the exemption applies. If a given NCM's duties are more routine, closely prescribed, and clerical in nature, then the exemption does not apply. The question for this Motion is whether Plaintiff presents any form of common proof capable of resolving the exemption inquiry, properly framed, on a classwide basis.

### B. Plaintiff Cannot Establish Predominance and Superiority Because She Does Not Offer Any Form of Common Proof to Adjudicate the Claims Without Devolving into Individual Inquiries

Once Plaintiff's false legal premise is eliminated, her Motion and "trial plan" collapse. Beyond citing *Rieve*, Plaintiff proffers the following evidence: (1) allegedly uniform job descriptions and policies and procedures; (2) Plaintiff's own declaration; and (3) data analysis by her expert. None is sufficient to carry her burden.

#### 1. The Policy and Procedure Evidence Does Not Preclude Exempt Status and Thus Does Not Avoid the Need for Individual Inquiries

The Ninth Circuit in *Marlo v. United Parcel Services, Inc.*, 639 F.3d 942, 948 (9th Cir. 2011), explained that, to support class certification, alleged policies and procedures not only have to apply to all class members, but they also must be capable of determining exempt status so as to avoid individual inquiries into how employees carry out their duties. There, the plaintiff proffered evidence of "UPS's centralized control, and uniform policies and procedures," including "various documents explaining activities that FTS [putative class members] are expected to perform, and procedures that FTS should follow." *Id.* Nevertheless, the Ninth Circuit affirmed the

rejection of class certification because "the fact that UPS expects FTS to follow certain procedures or perform certain tasks" did not resolve whether they were engaged in exempt administrative activities or exercised independent judgment and discretion. *Id.* Instead, the court would still be required to inquire into a given employee's actual work on a week-by-week basis. *Id.*; *see also, e.g., Brady*, 2012 WL 1059694, at *8 (finding common policies and procedures insufficient to support class certification because they did not preclude exempt work). Here, Plaintiff fails to proffer any form of common policy-and-procedure evidence that would itself foreclose exempt status and thus avoid the need for individual inquiries.

At the outset, Plaintiff proffers the NCM job description. Courts routinely find that a shared, general job description is insufficient to support class certification because it does not avoid the need to inquire into employees' actual duties.[5] Moreover, the job description here, on its face, is consistent with exempt status, as it reflects that NCMs are expected, among other things, to apply clinical experience and critical thinking skills and to negotiate with various parties to improve outcomes. A job description "is not common evidence of misclassification in the absence of evidence showing that the policy was wrongful." *Hamilton v. Genesis Logistics, Inc.*, No. CV13-01848, 2014 WL 4187941, at *7 (C.D. Cal. Aug. 22, 2014).

Plaintiff also argues that NCMs use a common computer system and must follow Liberty Mutual guidelines and procedures, and she attempts to compare this case to this Court's decision in *Dobrosky v. Arthur J. Gallagher Serv. Co. LLC*, No. 13-cv-00646, 2014 WL 10988092 (C.D. Cal. July 30, 2014). In *Dobrosky*, the record included, among other things, a "Best Practice" manual with a "series of forms," as well as other evidence to support the proposition that each step of a claims adjusters'

---

[5] *See, e.g., Rosenberg v. Renal Advantage, Inc.*, No 11-CV-2152 2013 WL 3205426, at *7-8 (S.D. Cal. June 24, 2013); *Aburto v. Verizon Cal.*, No. CV-11-03683, 2012 WL 10381, at *4 (C.D. Cal. Jan. 3, 2012); *Williams v. Lockheed Martin Corp.*, No. 09-CV-1669, 2011 WL 2200631 (S.D. Cal. June 2, 2011); *Gales v. Winco Food*, No. C-09-05813, 2011 WL 3794887 (N.D. Cal. Aug. 26, 2011).

work was delineated. *Id.* at *10-11, 13. Since *Dobrosky* was decided, however, the Ninth Circuit has confirmed that "[a]n obligation to utilize specific computer programs or to refer to reference manuals and guidelines does not necessarily prevent an employee from exercising independent discretion or judgment." *Bucklin*, 619 Fed. Appx. at 576; *see also In re Farmers Ins. Exch.*, 481 F.3d 1119, 1124, 1130-31 (9th Cir. 2006). In any event, Plaintiff submitted no similar evidence here to suggest that there is any such manual delineating how NCMs perform their jobs.

The closest Plaintiff comes to submitting any such evidence is a powerpoint presentation that contains only a high-level description of the job and expectations. Pl. Ex. 8. That presentation identifies the NCM as a "Clinical Strategist" and includes statements such as "Give your medical opinion – it matters." Plaintiff cites the presentation for the fact that claims adjusters retain responsibility over coverage determinations, but even that slide indicates NCMs advise on causality determinations. Nothing in the presentation indicates any specific, closely prescribed procedures that would necessarily eliminate the need for NCMs to exercise independent judgment and discretion in making causality findings, assessing treatment plans, or developing return-to-work strategies.

Plaintiff also cites quality assurance reviews. Pl. Ex. 6. But the QA metrics, if anything, are consistent with the exercise of independent judgment and discretion. They ask, for example, whether the NCM "strategically and aggressively manage[d] the medical treatment," and whether the NCM "timely develop[ed] an effective modified duty return-to-work plan." Pl. Ex. 6, at 2-3. The NCM "Objectives" cited by Plaintiff likewise reflect expectations such as: "Identifies opportunities to *improve work processes and outcomes*;" "Determine valid RTW/target dates utilizing disability guidelines, medical provider input, *and clinical judgment*;" "Identify RTW barriers, *develop innovative strategies* to mitigate;" "Actively engage, *negotiate* and collaborate … to achieve safe and timely RTW, *positively impacting TTD days*" [time off work]; and "Identify red/yellow flags and *proactively develop appropriate*

*strategies* to mitigate impact to the file." Pl. Ex. 14 (emphasis added).

Rather than *Dobrosky*, this case is more similar to *Marlo* and *Braun v. Safeco Ins. Co.*, No. CV 13-00607, 2014 WL 9883831, at *12 (C.D. Cal. Nov. 7, 2014). In *Braun*, the court held that the proffer of common policy and procedure evidence was insufficient to support class certification because the documents "establish only broad guidelines for class members' general duties that do not demonstrate the exemption issue is capable of class-wide proof." As *Braun* explained, the evidence before it – as here – "suggests that Defendants' policies and procedures vested class members with some level of discretion," but "critically, it does not establish the degree to which individual class members actually exercised discretion when handling claims." *Id.*

Likewise, Plaintiff's policy-and-procedure evidence does not "provide a basis for the jury to find that misclassification was the rule rather than the exception." *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 484 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942, 949 (9th Cir. 2011) (confirming that it is proper, on class certification, to evaluate evidence to determine whether it "could support a class-wide finding" on the exemption). Instead, the evidence reflected above indicates that an NCM's actual day-to-day work can depend heavily on, among other things, the nature of the NCM's particular claims and customers. *See supra* at 5-9. As a result, Plaintiff's policy-and-procedure evidence does not satisfy Plaintiff's burden of showing that common forms of proof, as opposed to individualized examination, will predominate at trial.

**2. The Anecdotal Testimony Is Not Sufficient to Support Class Certification**

Because the alleged policy and procedure evidence is not sufficient to establish misclassification on a classwide basis, Plaintiff would be forced at trial to resort to anecdotal testimony to show that, in performing their duties, NCMs in fact exercised little independent judgment and discretion and had no meaningful ability to affect anything of significance. In general, courts will refuse to certify a class based merely on anecdotal testimony absent a showing it is actually representative of the experience

of other class members. *See Pedroza v. Petsmart, Inc.*, No. 11-cv-00289, 2013 WL 1490667, at *8 (C.D. Cal. Jan. 28, 2013). In this case, it is not.

Here, for example, Plaintiff's self-serving description of her work experience does not match the testimony from another putative class member, Pamela Silvers, including on critical issues such as the extent to which they provide recommendations (as opposed to merely conveying information). *See supra* at 4-12. Moreover, any testimony from Plaintiff that her duties did not involve strategic or proactive planning would be contradicted by her performance reviews. *See supra* at 11-12; *see also* Mastin Dep. 61:25-65:16, 111:7-18, 128:19-22 (denying her duties involved negotiation, but then admitting on further examination that she had described herself as a "Professional Negotiator"). If other putative class members (or named plaintiff Wali) were called to testify at trial, their testimony could be more like Gainor, more like Silvers, or something different. At trial, the jury would not necessarily have to reach the same determination as to each person. It could find one NCM exempt and another not, thus confirming that the exemption is something that needs to be litigated, and that Liberty Mutual has a due process right to litigate, on an individual basis.

**3. The Billing Record Data Does Not Support Predominance or Show Uniformity of Actual Duties**

Plaintiff also proffers a declaration from an expert who reviewed NCM billing record data, which reflects time entries on claim files using task codes such as "Initial RN Assessment," "Conduct RN File Review," "Phone Provider," "Referral Coordination," and "Correspondence." To the extent Plaintiff is relying on this data to show commonality and predominance, her argument fails.

First, on their face, the task codes are generic descriptions of activities that do not allow the trier of fact to determine what the nature is of the actual work being performed. For example, an entry for "Correspondence" could be 10 minutes or it could be 90 minutes. *See* Crandall Decl. ¶ 22-23 & cht.5. One cannot tell, simply from the task code "Correspondence," whether the NCM was writing a routine letter

requesting a medical report or applying discretion and judgment while carefully drafting a letter intended to persuade a doctor to modify a failing treatment plan.

Second, the billing records show significant variability person-to-person and claim-to-claim. In particular, individual NCMs vary significantly in the time they spend on different tasks and the number of cases they touch per day. Crandall Decl. ¶¶ 7-10, 34. Plaintiff Gainor, for example, bills substantially more time to her "Initial RN Assessment" than virtually any other putative class member and is an outlier in other respects, including her average time billed per claim and her hours worked per day. *Id.* ¶¶ 11-14. The billing records also show that individual claims vary significantly in complexity, in the mix of tasks associated with the claims, and in the amount of time billed to different tasks. *See* Crandall Decl. ¶¶ 24-30 & chts.6, 7.

The record thus refutes Plaintiffs' allegation that NCMs' work is cookie-cutter or equivalent to an assembly-line in a production environment. Plaintiffs' expert admitted that he did not analyze variability across the class. Def. Ex. D., Eric Lietzow Deposition ("Lietzow Dep.") 30:24-33:22. He also conceded that whether Gainor was an outlier could be important because, if "named Plaintiff class rep is supposed to represent the other class members, you would think that they would have a similar experience to other members of the class." *Id.* at 31:4-13.

Third, not all NCMs bills their time. Several NCMs dedicated to two of Liberty Mutual's largest accounts stopped billing their time in 2014 and 2015 respectively. Tanriverdi Decl. ¶ 20. Thus, to the extent Plaintiff is relying on billing data to make a classwide determination, the same billing practices do not even apply classwide.

**C. Gainor Is Not a Typical or Adequate Class Representative**

A final, independent basis for denying class certification is that Gainor is not a typical or adequate class representative. In general, typicality requires that "the action is based on conduct which is not unique to the named plaintiffs," and "a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses

unique to [him or her].'" *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 557 (C.D. Cal. 2012) ("[e]ven an arguable defense peculiar to the named plaintiff … may destroy the required typicality … as well as bring into question the adequacy of the named plaintiff's representation"); *Jovel v. Boiron, Inc.*, No. 11-cv-10803, 2014 WL 1027874, at *3 (C.D. Cal. Feb. 27, 2014) (finding class representative inadequate due to credibility issues and conflicts in his deposition testimony).

As explained above (*see supra* at 23), the discrepancies between Plaintiff's performance reviews and how she has subsequently characterized her job duties raises significant credibility issues. The billing records also reveal Gainor to be an outlier in numerous respects. In addition, there are circumstances that are unique to her, including her performance warning and the "nervous breakdown" that led to her resignation. *See supra* at 11-12, 23. In each case, Gainor has attempted to paint those incidents as reflecting Liberty Mutual's overbearing supervision, but there is another side to that story, of course, and, in any event, there is no suggestion that similar incidents occurred with any other putative class member.

Because Gainor is the only class representative – Wali has not joined in the Motion – putative class members' claims would rise and fall with Gainor's story and credibility. The contradictions in the evidence and circumstances unique to her also demonstrate the lack of predominance and superiority: they confirm the need, and Liberty Mutual's due process right, to conduct individual cross-examination of putative class members to determine the scope and nature of how they actually carried out their job responsibilities.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be denied.

DATED: March 23, 2017 SIDLEY AUSTIN LLP

By: */s/* Douglas Hart
Attorney for Defendants