UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 16-1133 JGB (KKx) | Date | May 1, 2017 |
| Title | *Linda Metrow, et al. v. Liberty Mutual Managed Care LLC, et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Adele C. Frazier |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| Aparajit Bhowmik | Douglas Roger Hart |

**Proceedings:**   Order: GRANTING Plaintiffs' Motion for Class Certification (Dkt. Nos. 36, 36-1)

Before the Court is Plaintiffs' Motion for Class Certification. (Dkt. Nos. 36, 36-1.) The Court held a hearing on the Motion on May 1, 2017. After considering the papers timely filed in support of and in opposition to the Motion, and the arguments presented at the May 1, 2017 hearing, the Court GRANTS Plaintiffs' Motion for Class Certification.

## I. BACKGROUND

**A. Procedural History**

Liberty Mutual Managed Care LLC ("Liberty" or "Defendant") removed this putative wage and hour class action from the Superior Court of San Bernardino County on May 31, 2016. (Notice of Removal, Dkt. No. 1.) On August 2, 2016, Lynn Metrow, Linda Mastin, and Rose Ann Gainor ("Plaintiffs") filed their first amended class action complaint. (Dkt. No. 12.) Plaintiffs filed a motion to amend their first amended complaint on September 27, 2016, (Dkt. No. 21), which was unopposed by Defendant. (Dkt. No. 26.) On October 27, 2017, Plaintiffs filed their Second Amended Complaint. (Dkt. No. 29.) The Parties filed a joint stipulation to consolidate related cases <u>Lynn Metrow, et al. v. Liberty Mutual Managed Care, LLC</u>, Case No. 16-CV-0133-JGB (KKx) and <u>Shanan Wali v. Liberty Mutual Managed Care, LLC</u>, Case No. 16-CV- 02018-JGB (KKx), (Dkt. No. 33), which was granted by this Court on January 18, 2017. (Dkt. No. 34.) On January 26, 2017, Plaintiffs filed their Consolidated Class Action Complaint, alleging the following causes of action: (1) unfair competition in violation of California Business and Professions Code sections 17200, <u>et seq.</u>, (2) failure to pay overtime compensation in

violation of California Labor Code (hereinafter, "Labor Code") sections 510, 1194, and 1198, et seq., (3) failure to provide accurate itemized statements in violation of Labor Code section 226, (4) failure to provide wages when due in violation of Labor Code sections 201, 202, and 203, (5) violation of the Private Attorneys General Act under Labor Code sections 2698, et seq., and (6) failure to reimburse employees for required expenses in violation of Labor Code section 2802. ("CAC," Dkt. No. 35.)

On February 6, 2017, Plaintiffs filed their Motion for Class Certification. ("Motion," Dkt. Nos. 36, 36-1.) In support of their Motion, Plaintiffs submitted a declaration of Plaintiffs' counsel Aparajit Bhowmik ("Bhowmik Decl.," Dkt. No. 36-2) and the following sixteen exhibits:

- Exhibit 1: copy of the Arbitration Decision in the case of Taylor-Thomas v. Genex (Id. at Ex. 1);
- Exhibit 2: excerpts from the Rule 30(b)(6) Deposition of Liberty through Cynthia Ruth Tanriverdi on November 16, 2016 ("30b6 Dep.," Id. at Ex. 2);
- Exhibit 3: Defendant's responses to Plaintiffs' first set of interrogatories (Id. at Ex. 3);
- Exhibit 4: Defendant's correspondence identifying documents produced in response to Plaintiffs' interrogatories (Dkt. No. 36-3 at Ex. 4);
- Exhibit 5: copy of job descriptions for NCMs ("NCM job desc.," Id. at Ex. 5);
- Exhibit 6: Liberty's Quality Assurance Form for NCMs ("QA form," Id. at Ex. 6);
- Exhibit 7: Front Line Manager ("FLM") job description ("FLM job desc.," Id. at Ex. 7);
- Exhibit 8: performance review for FLM (Id. at Ex. 8);
- Exhibit 9:  referral form for NCM assignment ("Ref.," Id. at Ex. 9);
- Exhibit 10: document identified by Liberty "reflect[ing] expectations relating to job duties" ("NCM Expec.," Id. at Ex. 10);
- Exhibit 11: Rose Ann Gainor's Performance Review ("Perf. Rev.," Id. at Ex. 11);
- Exhibit 12: excerpts from Rule 30(b)(6) witness deposition (Id. at Ex. 12);
- Exhibit 13: Defendant's supplemental interrogatory responses ("Def. Supp. Resp.," Id. at Ex. 13);
- Exhibit 14: objectives for all NCMs after their performance reviews ("NCM Object.," Id. at 14);
- Exhibit 15: objectives for Senior NCMs ("Senior NCM Obect.," Id. at 15); and
- Exhibit 16: additional set of interrogatory responses from Defendant (Id. at Ex. 16.)

In addition to the Bhowmik Declaration, Plaintiffs also filed the following declarations:

- Declaration of Eric R. Lietzow (Lietzow Decl., Dkt. No. 36-4), which attaches the following Exhibits
    o Exhibit A: Lietzow's Curriculum Vitae (Id. at Ex. A);

- o <u>Exhibit B:</u> Summary of unpaid wage damages and related statutory and civil penalties for Lynn Metrow over five pay periods ("Terminated Avg. Damages," <u>Id.</u> at Ex. B);
- o <u>Exhibit C:</u> Summary of unpaid wage damages and related statutory and civil penalties for Linda Mastin ("Employed Avg. Damages," <u>Id.</u> at Ex. C);
- o <u>Exhibit D:</u> total average unpaid wage damages and related statutory and civil penalties over 184 bi-weekly pay periods for the Onsite Nurses ("Onsite Nurse Penalties," <u>Id.</u> at Ex. D);
- o <u>Exhibit E:</u> unpaid wage damages and related statutory and civil penalties over 653 bi-weekly pay periods for Telephonic Nurses ("Telephonic Nurse Penalties," <u>Id.</u> at Ex. E);
- o <u>Exhibit F:</u> table summarizing total liability related to Telephonic Nurses ("Total Liability Table," <u>Id.</u> at Ex. F.)
- Declaration of Heidi Alto (Alto Decl., Dkt. No. 36-5); and
- Declaration of Rose Ann Gainor (Gainor Decl., Dkt. No. 36-6.)

Defendant filed its Answer to the CAC on February 15, 2017. ("Answer," Dkt. No. 38.) On March 23, 2017, Defendant filed its Opposition to Plaintiffs' Motion. ("Opp'n," Dkt. No. 41.) In support of its Opposition, Defendant filed the following documents:

- Declaration of Sheryl K. Horwitz (Horwitz Decl., Dkt. No. 41-1), which includes the following five Exhibits
  - o <u>Exhibit A:</u> copy of correspondence among the Parties' counsel, during which Plaintiffs' counsel withdrew the Heidi Alto Declaration (Dkt. No. 41-2);
  - o <u>Exhibit B:</u> excerpts from the Gainor Deposition taken on March 2, 2017 ("Gainor Dep.," Dkt. Nos. 41-3, 41-4);
  - o <u>Exhibit C:</u> excerpts from Linda Mastin's Deposition taken on December 20, 2016 ("Mastin Dep.," Dkt. No. 41-5);
  - o <u>Exhibit D:</u> excerpts from Eric Lietzow's Deposition taken on March 16, 2017 (Dkt. No. 41-6);
- Declaration of Cynthia Tanriverdi (Tanriverdi Decl., Dkt. No. 41-7), including "The N Factor: How Nurses Add Value to Workers Compensation Claims" as Exhibit A (Dkt. No. 41-8);
- Declaration of Robert Crandall (Crandall Decl., Dkt. No. 41-9); and
- Declaration of Pamela Silvers (Silvers Decl., Dkt. No. 41-10.)

On April 5, 2017, Plaintiffs filed a Reply to Defendant's Opposition. ("Reply," Dkt. No. 42.) In support of their Reply, Plaintiffs filed the Declaration of Aparajit Bhowmik (Bhowmik R Decl., Dkt. No. 42-1), which attaches excerpts of the Deposition of Pamela Silvers as Exhibit 1. (Silvers R. Decl., Dkt. No. 42-1 at Ex. 1.)

### B. Factual Allegations

Liberty is a California limited liability company that provides property and casualty insurance. Liberty's casualty division has a Workers' Compensation department that obtains revenue from insurance premiums that are paid by employers. (30b6 Dep. at 30:21-23.) According to Liberty, "[w]hen an employee is injured on the job, the employee, the employer, and the workers' compensation insurer all have an interest in ensuring that the employee receives appropriate care and returns to work in a safe and timely manner." (Opp'n at 6.) Liberty describes that while the claims adjusters are primarily responsible for handling claims, they often lack the medical expertise to determine alternative treatment options that may reduce costs. (Tanriverdi Decl. ¶ 4.) This is where Liberty comes in.

To control health costs and reduce disability expenses, Liberty provides integrated managed care services, whereby claims adjusters assign a Nurse Case Manager ("NCM") to the claim pursuant to "NCM referral criteria." ( 30b6 Dep. at 34:17-23.) Liberty's NCMs work in conjunction with claims adjusters, clients, and medical providers, to get employees on workers' compensation back to work. (Answer ¶ 3.) According to Liberty, "the role of an NCM is to assess the prescribed medical treatment and develop return to work strategies." (Opp'n at 6.) The NCMs are expected to use "their clinical judgment to analyze diagnoses, identify gaps in treatment, and make recommendations that, consistent with the best interests of the patient, would be more cost-effective and help the employee return to work faster." (See, e.g., 30b6 Dep. at 41:11-15.)

Plaintiffs Lynn Metrow, Linda Mastin, Rose Ann Gainor, and Shanan Wali worked as NCMs for Liberty and at all times were classified as salaried employees exempt from overtime pay and meal and rest breaks. (CAC ¶¶ 4-8; Answer ¶¶ 4-6, 8, 32-35.) Plaintiffs allege that Liberty misclassified them as "exempt." (CAC ¶¶ 10, 11.) Plaintiffs assert they cannot be exempt from overtime pay or meal and rest breaks under the administrative exemption because as NCMs, they do not have ultimate decision-making power and none of their job duties allow them to exercise their independent judgment and discretion. (Id.) Accordingly, Plaintiffs bring this action on behalf of themselves and a California class of persons who are or previously were employed by Liberty as NCMs and were classified as exempt from overtime wages during the relevant class period. (Id. at ¶ 12.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions. A party seeking class certification must demonstrate the following prerequisites: "(1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citing Fed. R. Civ. P. 23(a)). The party may not rest on mere allegations; it must provide facts to satisfy those requirements. See Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1309 (9th Cir. 1977) (citing Gillibeau v. Richmond, 417 F.2d 426, 432 (9th Cir. 1969)). Although not mentioned in Rule

23(a), the party seeking certification must also demonstrate that the class is ascertainable. See Keegan v. Am. Honda Motor Co., Inc., 284 F.R.D. 504, 521 (C.D. Cal. 2012).

After satisfying the five prerequisites of numerosity, commonality, typicality, adequacy, and ascertainability, a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. See Fed. R. Civ. P. 23(b)(1) to (3).

A trial court has broad discretion regarding whether to grant a motion for class certification. See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). However, a party seeking class certification must affirmatively demonstrate compliance with Rule 23—that is, the party must be prepared to prove that there are in fact sufficiently numerous parties and common questions of law or fact. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550-51 (2011). A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Id.

### III. DISCUSSION

**A. Motion for Class Certification**

Plaintiffs move to certify a class pursuant to Rules 23(a) and 23(b)(3) of "[a]ll individuals who are or previously were employed by Defendant Liberty Mutual Managed Care, LLC as Telephonic Nurse Case Managers in California between February 24, 2012 to the present." (Mot. at 18.) Plaintiffs move to certify this class based on the allegations underlying the first through third causes of action in the CAC, which include: (1) unfair competition under section 17200, et seq. (2) failure to pay overtime compensation under Labor Code sections 203 and 510, and (3) failure to provide accurate itemized statements under Labor Code section 226. (Id.) In addition, the Motion seeks a court order designating Rose Ann Gainor as the class representative and appointing Blumenthal, Nordrehaug & Bhowmik as class counsel. (Dkt. No. 36, 2.)

**B. Law Applicable to Class Claims**

All three of Plaintiff's causes of action rely on the same theory of liability: Defendant misclassified all of the NCMs as exempt under the California Labor Code, and the Class Members were not paid overtime, provided with accurate wage statements, or paid on time as a result of that misclassification. (Mot. at 7.) It is undisputed that Defendant classified all Class Members as exempt during the class period. (Answer ¶ 14.) It is also undisputed that none of Liberty's NCMs receive overtime pay for days they work more than eight hours. (30b6 Dep. at 51:6-8.)

California requires employers to pay overtime premiums and provide accurate itemized wage statements. See Cal. Lab. Code §§ 510, 226. California Labor Code § 515 provides that the Industrial Welfare Commission ("IWC") may establish exemptions from these requirements. Pursuant to section 515, the IWC has promulgated exemptions for professional and administrative employees. See California Wage Order 4-2001, codified at 8 Cal. Code. Regs. § 11040 ("Wage Order 4"). "An employer who claims an exemption from the California Labor Code's overtime provisions has the burden of showing that the exemption applies." Rieve v. Coventry Health Care, Inc., 870 F. Supp. 2d 856, 876 (C.D. Cal. 2012). Defendant asserts that Plaintiffs and the putative class qualify as exempt from overtime pay under the administrative exemption because NCMs, "as a matter of regular practice, improve patient outcomes and achieve substantial savings." (Opp'n at 24.)

Pursuant to Wage Order 4, a person qualifies for the administrative exemption if her duties and responsibilities involve:

> (I) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers; . . . and . . .
>
> (b) Who customarily and regularly exercises discretion and independent judgment; and
>
> (c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity . . . ; or
>
> (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or
>
> (e) Who executes under only general supervision special assignments and tasks; and
>
> (f) Who is primarily engaged in duties that meet the test of the exemption.

Cal. Code Regs. § 11040(1)(A)(2)(a)-(f). In addition, the employee must earn a monthly salary equivalent to no less than two times the state minimum wage for full-time employment. Id. § 11040(1)(A)(2)(g). Wage Order 4 expressly incorporates the following provisions of the Fair Labor Standards Act ("FLSA") effective as of January 1, 2001, which are used to construe the activities which constitute exempt and non-exempt work: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215. Cal. Code Regs. § 11040(1)(A)(2)(f).

Plaintiffs argue that the administrative exemption does not apply to the putative class because Class Members' job duties are not "directly related to management policies or general business operations," they are not performed "under only general supervision," and in performing such duties, they could not exercise "discretion and independent judgment." (Reply at 1, 4) (citing Rieve, 870 F. Supp. 2d at 869)("Because the test is conjunctive, Plaintiff need only demonstrate that Defendants have not met their burden as to one part of the test.").

### D. Ascertainability

"In addition to the explicit requirements of Rule 23, an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists." Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011); see also Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)."). "Courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed." Schwartz v. Upper Deck Co., 183 F.R.D. 672, 679-80 (S.D. Cal. 1999). A class is ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member" using objective criteria. Keegan, 284 F.R.D. at 521 (citation omitted). Defendant does not dispute the class's ascertainability and the class of NCMs can be ascertained from Defendant's records. (Lietzow Declaration ¶ 10.) Accordingly, the Court finds that the class of current and former Liberty NCMs is ascertainable.

### E. Rule 23(a)

#### 1. Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. See Fed. R. Civ. P. 23(a)(1). Additionally, there is no particular number cut-off, as the specific facts of each case may be examined. Ballard v. Equifax Check Servs., Inc., 186 F.R.D. 589, 594 (E.D. Cal. 1999). Courts have not required evidence of exact class size or the identities of class members to satisfy the requirements of Rule 23(a)(1). See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993). Plaintiffs propose a class of 51 current and former employees in California in the job positions at issue. (Mot. at 21 (citing Interrogatory 2 at Ex. 16)); (see also 30(b)(6) Dep. at 31:14-17)("I would say about 58.") Defendant does not contest numerosity. A class of fifty one is sufficient to make joinder of all class members' claims impracticable. See In re Cooper Companies Inc. Sec. Litig., 254 F.R.D. 628, 634 (C.D. Cal 2009) ("[N]umerosity is presumed where the plaintiff class contains forty or more members."). This is sufficient to satisfy the numerosity requirement. Accordingly, the Court finds that numerosity has been satisfied.

#### 2. Commonality

Courts have construed Rule 23(a)(2)'s commonality requirement permissively. See Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Jimenez v. Allstate Ins. Co., 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)). Nevertheless, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does

not mean merely that they have all suffered a violation of the same provision of law." Wal-Mart, 131 S. Ct. at 2551 (citation omitted). The "claims must depend on a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. The common question or questions must also be "apt to drive the resolution of the litigation," which turns on the nature of the underlying legal claims in the case. Jimenez, 765 F.3d at 1165 (quoting Abdullah v. U.S. Sec. Associates, Inc., 731 F.3d 952, 962 (9th Cir. 2013)). Thus commonality requires an understanding of the nature of the underlying claims. Id. (citing Parsons v. Ryan, 754 F.3d 657, 676 (9th Cir. 2014)).

As discussed, the merits inquiry in this action turns on whether it was proper for Defendant to categorically exempt all NCMs from overtime pay under the administrative exemption. For this inquiry, Plaintiffs point to three legal questions common to all class members: whether Defendant can meet its burden of demonstrating that the actual work NCMs primarily perform is "directly related to management policies or general business operations," is performed under only "general supervision," or that in performing such tasks, NCMs customarily exercise "discretion and independent judgment." (Mot. at 21.) In response, Defendant argues that Plaintiffs' Motion relies on the false premise that NCMs are categorically non-exempt. (Opp. at 21.) To that end, Defendant argues that the Rieve case on which Plaintiff relies, "misinterpreted California's administrative exemption." (Id.) The Court finds Defendant's analysis of Rieve premature as it goes to whether Plaintiffs will be successful in proving they are non-exempt on the merits. Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194–95 (2013)("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). For purposes of Rule 23(a)(2), it is sufficient that Plaintiffs have raised a single common contention that Defendant's policy improperly treats all employees alike for exemption purposes. Gales v. Winco Foods, No. C 09-05813 CRB, 2011 U.S. Dist. LEXIS 96125, 2011 WL 3794887, at *2 (N.D. Cal. Aug. 26, 2011) (finding policy of classifying all employees as exempt met commonality requirement because the "theory of the case presents several common questions, such as whether WinCo's classification was correct, whether it was done knowingly, whether all class members share similar job duties, and the proper categorization of those duties as exempt or not-exempt").

It is undisputed that all members of the putative class were classified as exempt from overtime pay under the administrative exemption. Both telephonic nurses and onsite nurses are paid on average between approximately $38 to $39 dollars per hour, which is more than two times California's minimum wage for full time employment. (See Lietzow Decl. ¶ 16.) None of the NCMs received overtime pay and their work is designated under the same general job description. (30b6 Dep. at 51:3-8.) The members of the proposed class, therefore, have all suffered from the same injury. Plaintiffs have advanced sufficient common questions for which adjudication will offer common answers. See Abdullah v. U.S. Sec. Associates, Inc., 731 F.3d 952, 963 (9th Cir. 2013) (finding Rule 23(a)(2) satisfied where the employer adopted an exemption to off-duty meal periods for the entire class); Greko v. Diesel U.S.A., Inc., 277 F.R.D. 419, 425 (N.D. Cal. 2011) (finding commonality where "all assistant managers were classified as exempt"); Casida v. Sears Holdings Corp., No. 1:11-CV-01052 AWI, 2012 U.S. Dist. LEXIS

111599, 2012 WL 3260423, at *12 (E.D. Cal. Aug. 8, 2012) (finding commonality satisfied where "Plaintiffs seek class certification based upon a corporate blanket exemption policy"). Defendant's policy of applying this exemption to the NCMs is a "significant question of law," Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012), that is "apt to drive the resolution of the litigation" in this case. Wal-Mart, 131 S. Ct. at 2551. As such, the Court is persuaded that Plaintiffs have satisfied the commonality requirement of Rule 23(a).

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Wolin v. Jaguar Land Rover North Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" Ellis, 657 F.3d at 984 (quoting Hanon, 976 F.2d at 508). Thus typicality is generally satisfied if the plaintiff's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020. Moreover, satisfying the typicality prong requires, in the least, that "a class representative must be part of the class." General Telephone Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982).

Plaintiff argues that the typicality requirement is satisfied because "Defendant uniformly asserts the same affirmative defense against all of the NCMs. . ." (Mot. at 7.) Defendant argues that Gainor's experience is not "typical" of the class because she is "an outlier across numerous metrics." (Opp. at 14.) Defendant points out that Gainor spends significantly more time on her initial case assessments than most other NCMs and her statement about needing to obtain prior approval before engaging any resource is not a uniform requirement. (Id. at 14, 16.)

The Court finds Defendant's arguments largely irrelevant to the issue of typicality. In Defendant's Answer, it conceded it would rely on the same affirmative defense for all class members: that NCMs were properly classified as exempt from overtime requirements as employees working in an administrative or professional capacity under the Fair Labor Standards Act, the California Labor Code, and the California Wage Orders. (Answer ¶ 14.) The Court finds that Plaintiffs have provided ample evidence that all NCMs share the same job responsibilities, are assessed under the same standardized criteria, and are subject to the same degree of supervision. (Gainor Decl. ¶¶ 3-10.) The deposition testimony Defendant proffers supports this conclusion. Each NCM's testimony confirms that they do not have the authority to consult outside resources, adjust treatment plans or benefits, or depart in any way from the recommendations of the treating physicians without prior approval. (See, e.g., Silvers R Dep. at 16:15-17; Gainor Dep. at 17:4-10; Mastin Dep. at 17-20.)

That Gainor may spend more time on certain tasks than other NCMs does not render her claims atypical. The time spent on tasks does not change their inherent nature for purposes of the administrative exemption. Casida v. Sears Holdings Corp., No. 1:11-CV-01052 AWI, 2012 WL 3260423, at *13 (E.D. Cal. Aug. 8, 2012). The time spent on a task in relation to other tasks may relate to whether Gainor will be able to prove non-exempt status on the merits or the amount

of damages she may receive, but this does not defeat typicality. Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010)("Whether they experienced premature tire wear at six months, nine months, or later goes to the extent of their damages and not whether named appellants "possess the same interest and suffer[ed] the same injury as the class members."). It also does not present a danger that Gainor will be preoccupied with defenses unique to her because this defense can be raised against other members of the proposed class. Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) ("[A]s a general matter, individualized defenses do not defeat typicality.") Nor do the purported discrepancies in Gainor's performance reviews and her subsequent characterization of her job duties bear on typicality. "Contradictions in the testimony affect the weight given to the evidence, rather than its admissibility, and at the class certification stage the Court is unable to weigh the evidence." (citing Marlo v. UPS, Inc., 639 F.3d 942, 949 (9th Cir.2011)).

Most of the arguments Defendant raises go to the predominance requirement, not typicality. Casida, 2012 WL 3260423, at *13 (finding that differences in how employee-plaintiffs spent their time was not relevant to the typicality requirement where the defendant employer had a blanket exemption policy that covered all members of the putative class). Plaintiffs' claims are premised on the contention that Defendant misclassified each putative class member based upon the same misapplication of federal and California law. Defendant, moreover, fails to point to any unique defenses that might render Gainor's claims atypical. The Court, therefore, finds that typicality is satisfied.

### 4. Adequacy

Finally, under Rule 23(a)(4), the named plaintiff must be deemed capable of adequately representing the interests of the entire class, including absent class members. See Fed. R. Civ. P. 23(a)(4) (requiring "representative parties [who] will fairly and adequately protect the interests of the class"). The adequacy inquiry turns on: (1) whether the named plaintiff and class counsel have any conflicts of interest with other class members and (2) whether the representative plaintiff and class counsel can vigorously prosecute the action on behalf of the class. See Ellis, 657 F.3d at 985.

Defendant argues that Rose Ann Gainor is not an adequate class representative. To this end, Defendant maintains that the discrepancy between her performance reviews and how she has subsequently characterized her job duties "raises significant credibility issues." (Opp. at 30.) Defendant further asserts that Gainor is an outlier because her performance warnings and the "nervous breakdown" leading to her resignation are unique circumstances that are not shared "with any other putative class member." (Id.) The Court finds Defendant's arguments unavailing. For one thing, the deposition testimony to which Defendant refers signaling Gainor's lack of credibility is not even her testimony. (Opp'n at 28.) It was Linda Mastin who testified that she did not disagree with a statement in a document describing her as a "professional negotiator." (Id.) Not only is this completely irrelevant to Gainor's adequacy to represent the class, but the specific testimony Defendant advances also bears little on the alignment of Gainor's interests to the interests of the rest of the class. The "professional negotiator"

characterization is contained in a publication written by Liberty. (Mastin Dep. 111:11-12.) Linda Mastin even states "I don't recognize the changes in this version." (Id.) Even putting that aside, credibility is only relevant to the adequacy analysis if credibility problems relate to "issues directly relevant to the litigation" or when "there are confirmed examples of dishonesty, such as a criminal conviction for fraud." Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 525 (C.D. Cal. 2012)(citing Harris v. Vector Marketing Corp., 753 F. Supp. 2d 996, 1015 (N.D.Cal.2010)). This testimony does not evince a lack of credibility, and even if it could, it neither pertains to an important issue in this litigation nor reflects a divergence of interests among class members.

The Court is persuaded that Rose Ann Gainor will adequately represent the interests of the class. Gainor's interest in this action does not differ from those of the other Class Members in any materially significant way. The time she spent on her initial assessments relates to damages and does not raise the risk that her interests will conflict with those of the class. It therefore does not bear on her adequacy as class representative. See Wolin, 617 F.3d at 1175 (holding that the possibility that class members will recover different damages or have differing chances of ultimate success on their claims does not inform whether the class representatives "possess the same interest and suffer[ed] the same injury as the class members."). Gainor has personal experience with the claims of this lawsuit and is familiar with the underlying facts. (Gainor Decl. ¶¶ 16, 18, 19.) Class counsel has substantial experience handling large employment related class actions and has been found to be qualified class counsel in prior actions. Dobrosky v. Arthur J. Gallagher Serv. Co., LLC, No. EDCV130646JGBSPX, 2014 WL 10988092, at *9 (C.D. Cal. July 30, 2014) (citing Gripenstraw v. Blazin' Wings, Inc., No. 1:12-CV-00233-AWI, 2013 WL 6798926, at *6 (E.D.Cal. Dec. 20, 2013); Ohayon v. Hertz Corp., No. 5:11-CV-01662 EJD, 2012 WL 4936058, at *3 (N.D.Cal. Oct. 16, 2012)). In short, Gainor, and Plaintiffs' counsel, are each adequate to pursue this action on behalf of the class. As such, on these facts, the Court finds the adequacy requirement satisfied.

**F. Rule 23(b)(3)**

Of the three possible bases for certification under Rule 23(b), Plaintiffs seek certification under Rule 23(b)(3) which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

**1. Predominance**

The analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)." Hanlon, 150 F.3d at 1022. "Rule 23(b)(3) focuses on the relationship between the common and individual issues." Id. Class certification under Rule 23(b)(3) is proper when common questions present a significant portion of the case and can be resolved for all members of the class in a single adjudication. Id.

Plaintiffs move to certify the class for the first through third causes of action. (Mot. at 7.) According to Plaintiffs, the predominant overriding claim is that Defendant misclassified the class of NCMs as exempt. (Id.)  Plaintiffs argue that common issues predominate the resolution of the "directly related" test,  the "general supervision" test, and the question of whether NCMs had "discretion and independent judgment" as to matters of significance.  (Reply at 8, 14, 11.)   The remaining class claims for failure to pay timely wages under Labor Code section 203, failure to provide accurate wage statements under Labor Code section 226, and Unfair Competition under section 17200 are derivative of the misclassification claim.  (Id.)

Defendant, however, argues that common issues do not predominate because "Plaintiff lacks any form of common proof that would enable her to adjudicate liability without individual inquiries overwhelming the trial." (Opp. at 21.)  The thrust of Defendant's argument is that since its customers have different requirements, injured workers have different problems, and NCMs each make recommendations in their own way, determining whether the administrative exemption applies requires examining each NCM's day-to-day work.  (Id. at 24.)

The Court now assesses whether Plaintiffs have offered "significant proof" on a predominant common policy or practice "that could affect the class as a whole." Ellis, 657 F.3d at 983.  All NCMs must be registered nurses so they all entered this employment relationship with the same specialized skills.  (30b6 Dep. at 50:3-7.)  Further, all of the Class Members received the same training, including: (a) a virtual "prework course," introducing each prospective NCM to the Workers' Compensation system and the role of a nurse care manager, and (b) on-site training, pursuant to a "Nurse Case Manager New-Hire Training Manual." (30b6 Dep. at 75:15-17,  74:14-18.)   Indeed, the same manual is used for the training of all NCMs.  (Id. at 76:23-25.)

 All NCMs have the same job description and primarily perform the same tasks.  (See NCM job desc.)  Some NCMs work from home and some NCMs work in the field, but on this record, the substance of their work does not appear to materially differ.  (See, e.g., 30b6 Dep. at 56:16-25; Dkt. No. 36-2 at 128:5-9.)  Defendant describes the NCM job responsibilities as effectively communicating "with claimants, medical professionals, claims staff, attorneys and others to obtain information, and to negotiate medical treatments and return to work plans using critical thinking skills, clinical expertise and other resources as needed to achieve optimal case outcome."  (Opp'n at 9.)  The conduct of every NCM is regulated by several corporate policies and procedures, guidelines for evidence-based medicine and utilization management, customer requirements, and state law.  (NCM Expec.)  All NCMs have the same caseloads: 31 for field NCMs and 55 for telephonic NCMs.  (30b6 Dep. at 47:3-5.)  The Class Members work substantially similar hours.  Every telephonic nurse has a billable goal of 7.1 hours a day and every field nurse has a billable goal of 8 hours a day.  (Id. at 52:16-22.)

Defendant challenges Plaintiffs' reliance on its general job descriptions and uniform policies.  The Court, however, finds the uniform description of NCMs' job responsibilities constitute common proof because the deposition testimony and Defendant's own admissions show these descriptions and policies reflect the work that all NCMs realistically perform.  For one thing,

cases are referred to all NCMs by claims specialists based on the same internal referral criteria. (30b6 Dep. at 34:17-25, 35:1-4.)  The Court can infer from such uniform referral criteria that the NCMs are expected to perform substantially similar tasks.  All of the job duties of the Class Members are limited by California workers' compensation laws, evidence-based medicine standards, and Liberty's internal metrics. (NCM Expec.)  In any event, despite the complexity of each case and the individual customer requirements, all NCMs spend 71% of their time on the same five tasks.  Defendant does not refute this assertion. (See Crandall Decl. ¶ 10; Lietzow Decl. ¶ 13.)  Defendant's expert acknowledges that while there are 66 unique tasks listed in the billing data, the top five tasks account for approximately 71% of total bill time. (Crandall Decl. ¶ 10.)  These top five tasks are "conducting RN File Review," "Phone Provider," "Phone Claimant," "Correspondence," and "Assessment Initial RN." (Id.)  Defendant's expert also acknowledges that "[t]he other individual tasks were less common" and at most, only amounted to 30% of billed time. (Id.)  That NCMs spend varying amounts of time on each task, therefore, does not alter the fact that they all spend a significant majority of their time performing the same five essential functions.

In addition, all NCMs must perform these tasks chronologically based on a uniform schedule and the tasks must be completed within a specified time period.  Also, every NCMs' performance of each task is evaluated based on the same standardized criteria.  The record shows that every NCM completes their assignment based on standardized step-by-step instructions. (See, e.g., 30(b)(6) Dep. at 38:5-18.)  For instance, all NCMs are subject to the same standards for responsiveness. (Id. at 100: 10-14.)  NCMs must: (a) accept a case within one business day, (id. at 59:13-17), (b) make "three-point contacts" within "two business days of accepting the referral," (id. at 60:13-16), and (c) complete their initial assessment within the first ten days of reviewing the mechanism of injury. (Id. at 61:20-25.)  This assessment must be done on a "specific strategy template." (Id. at 62:8-9.)  All NCMs document every activity performed on a case through journal entries on the same EXPRS system. (Id. at 70:5-12, 124:2-7.)

All NCMs are evaluated based on the same measures for efficiency and scale. (Id. at 105:5-7.)  For example, NCMs must respond to emails within four hours, (id. at 100: 12-14), must respond to letters within one day, (id. at 100:21-22), and must answer the phone live within a matter of hours. (Id. at 101:19-25.)  The measures for "customer service experience" are also the same for every NCM. (Id. at 103:5-7.)  As far as the "quality" of their work, all NCMs are subject to the same quality assurance ("QA") standards. (Id. at 59:9-12.)  All of the NCMs are reviewed on a set schedule by a direct manager (or Front Line Manager) and by a regional director. (Id. at 85:22-25.)  Each NCM has two files reviewed per month for QA. (Id. at 103:16-18.)  Every NCM's QA is done on the same QA form. (Id. at 120:9-11.)

Defendant describes this QA as "a systematic process to evaluate expectations of the role against the standards." (Id. at 85:13-15.)  The formal QA program involves looking at the nurse's in-box and running a weekly report that involves "spot-checking" and "time-tracking." (Id. at 83: 11.)  Liberty also has "Telephony" reports that Front Line Managers and Second Level Managers use to evaluate the percent of calls answered live and the inbound/outbound ratio. (Id. at 111:5-11.)  The managers also run annual time-tracking reports where they look to see whether

NCMs' tracking activities match each journal entry posting. (Id. at 123:22-25.)   In short, regardless of how each NCM approaches her job, she is expected to complete each case on the same time frame, perform each task within a standardized amount of time, and must conform her conduct to clearly delineated procedures and policies.

### a. Directly Related to Management or General Operations

To defeat application of the administrative exemption, Plaintiffs need only demonstrate that one of the elements is unsatisfied.  See Rieve, 870 F. Supp. 2d at 876.  Thus, if the Court finds that disproving one element of the administrative exemption is susceptible to common proof, Plaintiffs will have satisfied the predominance requirement under Rule 23(b).

Plaintiff asserts that the following uniform policies and policies constitute common proof for purposes of determining whether each Class Member's "job duties" are directly related to Liberty's management or general operations:

- Standardized training for all NCMs;
- Common job duties;
- Quality and Performance review using standardized objective criteria for all NCMs;
- Uniform standards and protocols including common restrictions set out in standard guidelines; and
- Common supervisory procedures.

 In order to qualify for the administrative employee exemption, the NCMs' work must be "directly related to management policies or general business operations" of Defendant or its clients.  Cal. Code Regs. § 11040(1)(A)(2)(a)(I).  The California Supreme Court clarified the meaning of this element:

> Work qualifies as "directly related" if it satisfies two components. First, it must be qualitatively administrative.  Second, quantitatively, it must be of substantial importance to the management or operations of the business. . . . Federal Regulations former part 541.205(b) discusses the qualitative requirement that the work must be administrative in nature. It explains that administrative operations include work done by "white collar" employees engaged in servicing a business. Such servicing may include, as potentially relevant here, advising management, planning, negotiating, and representing the company.

Harris v. Superior Court, 53 Cal. 4th 170, 181-82 (2011).  In addition, the Ninth Circuit explained that this requirement is met if the employee engages in "running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs."  Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1125 (9th Cir. 2002) (interpreting 29 C.F.R. § 541.2) (internal quotation omitted).

Defendant argues that Plaintiffs cannot establish predominance by relying on: (1) its allegedly uniform job descriptions and policies and procedures, (2) Plaintiff's own declaration, and (3) data analysis by Plaintiff's expert. (Opp. at 24.) As to the uniform policies, Defendant maintains that "the policies and procedures alleged do not dictate the substance of the NCM's analytical work or themselves can vary." (Opp'n at 12.) Similarly, Defendant argues that its billing records "show that individual claims vary significantly in complexity, in the mix of tasks associated with the claims, and in the amount of time billed to different tasks." (Id. at 29.)

Defendant states that all NCMs' job duties qualitatively involve "servicing" the business of Liberty Mutual and its customers by, among other things, "planning" return-to-work strategies, "negotiating" with providers and employers, and performing a business "control" function as to the appropriateness and cost-effectiveness of care. (Opp. at 20.) Defendant characterizes NCMs' job responsibilities as quantitatively administrative because in generating significant cost savings, NCMs add significant value to the claims they work on, which is of substantial importance to Liberty's operations. (Id.) Defendant contends that any one of its NCMs may be exempt depending on the degree of cost-savings she generates for the customer or Liberty, which relies on the "extent to which he or she is able to affect the trajectory of treatment plans and get employees back to [sic] faster." (Id.) Defendant also acknowledges that if an NCM's duties are primarily routine or clerical, like simply providing information to others, then the NCM would be non-exempt. (Id.) As such, Defendant maintains that there is ultimately, "no way to determine how each NCM actually carries out his or her duties without individualized inquiry" since "NCMs' actual duties can vary depending on their specific assignments, customers, and cases," (Id. at 7.) Plaintiffs, on the other hand, argue that the issue of whether Class Members' job duties fall within the first prong of the administrative exemption can be resolved through common proof because none of the NCMs can take affirmative action that would bind anyone other than themselves. (Mot. at 8.)

In the context of employment exemptions, individual inquiries are necessary because the "crucial touchstone" is the "employee's actual job duties and responsibilities." Campbell v. PricewaterhouseCoopers, LLP, 642 F.3d 820, 830 (9th Cir. 2011). But, "uniform corporate policies will often bear heavily on questions of predominance and superiority. Indeed, courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes." In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 958 (9th Cir. 2009). "Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." Id. at 958-959. The Court finds Defendant's uniform policies to be "significant proof" likely to drive the resolution of the proper classification of the NCMs.

The Court finds that the work each class member actually performs is sufficiently similar to determine whether or not it is primarily administrative. That Defendant's uniform job descriptions and corporate policies capture each NCM's actual duties is corroborated by Defendant's billing records and its Rule 30(b)(6) witness. (30b6 Dep. at 51:20-25.) As discussed, Defendant argues that its billing records cannot constitute "common proof" of the tasks each NCM completes on a daily basis since there is large variation in the "mix of tasks

associated with the claims, and in the amount of time billed to different tasks." (Opp'n at 29.) But the billing records show that the "expected job duties were all actually performed." (Mot. at 27.) (See Crandall Decl. ¶ 10; Lietzow Decl. ¶ 13.) The Court does not find the variation in the complexity of potential cases or client preferences sufficient to defeat predominance since the Parties agree that 71% of NCMs spend their time on the same five tasks. (30b6 Dep. at 114:9-20.) Moreover, any of the tasks that could conceivably fall within exempt work are not encompassed within the NCMs billable hours. (Id. at 55:11-14.)

Further, the time spent on each task could only defeat predominance under the first prong of the administrative exemption only insofar as each NCM had the authority to determine her job responsibilities. But the NCMs do not determine their "job responsibilities" based on customer needs or staffing needs; this is done by their overseers. (Id. at 82:17-19.) While Liberty seems to vest the applicability of the administrative exemption on each NCM's ability to add significant value to the claims they work on, this "value" is limited to NCMs' "closure rates" which are set by a second-line manager. (Id. at 88:25, 89:9-10.) Indeed, Liberty determines the "value" NCMs add based on each NCM's "production ratio" which is calculated based on the same standardized criteria. (Id. at 88:25, 89:9-10.) Other than the 71% of time spent comparing treatments prescribed to evidence-based medicine guidelines, the remaining "limited assignments" on which NCMs could conceivably spend their time have been described by Defendant as just "more simple tasks." (30b6 Dep. at 46:16-20.) The record shows that the majority of NCMs' actual working time is spent performing the same tasks, which persuades the Court that determining whether such tasks are "primarily" exempt or not exempt can be done on a class wide basis.

The Court, therefore, does not find substantial variation between each Class Member's ability to determine Liberty's overall course or policies. The NCMs are uniformly without authority to direct Liberty's policies. The way Liberty ensures that revenue is being met for the workers' compensation division is through revenue goals, that are "set at a higher management level." (30b6 Dep. at 31:15-22.) In fact, NCMs' objectives in carrying out Liberty's business are promulgated to them through two layers of managerial oversight. Besides, those performing these supervisory roles don't even have the authority to determine Liberty's management policies or the way Liberty operates its business. The regional manager is responsible for "operationalizing [Liberty's] metrics." (Id. at 80:24-25.) The regional manager does not even set the metrics. Indeed, if those overseeing the NCMs merely "deliver the metrics," it appears that the NCMs' immediate supervisors do not perform work of substantial importance to the management or operation of Liberty's business. (Id. at 81:4-5.) Thus, contrary to Defendant's assertion, the degree to which an NCM's execution of her responsibilities can substantially impact Liberty's "business objectives" is confined by the "metrics" contained in the "department goals," and does not appear to vary with how each NCM spends her time. (Id. at 81:2-4.)

Even if the way each NCM allocates her time influenced the "metrics" by which management determines optimal strategies for achieving significant cost savings, the record shows that NCMs uniformly lack discretion over how much time they spend on specific tasks.

NCMs are expected to devote the same amount of time to each task, and are penalized for departing from the uniform schedules for all of their assignments. For instance, Defendant determines whether NCMs are doing their jobs efficiently and whether they should receive a bonus by referring to annual billing requirements, which are 1,585 hours for telephonic nurses and 1,785 for field nurses. (30b6 Dep. at 48:14-21.) What is more, Liberty has "tactical" internal objectives, that include necessary steps that must be taken within 30, 60, 90, and 120 days. (Id. at 74:8-13.) In addition to annual time-tracking audits, Liberty also performs monthly reports that look not only to "total hours," but also the time each NCM bills by "specific activity." (30b6 Dep. at 122:14-17.) These audits are used by front line and secondary managers to ask "Are we spending our activities on the right thing for that case?" so management can recalibrate how each NCM should spend her time. (Id. at 122: 16-24.) Thus, the testimony of Defendant's own witness shows that Defendant's billing records reflect the realities of each Class Member's job.

Contrary to Defendant's assertion, therefore, it does not appear that Class Members retain sufficient discretion to use their time for "strategic or proactive planning" to discount Plaintiffs' offer of common proof. (Opp'n at 28.) As such, it does not appear that individualized inquiries are necessary to determine whether Class Members are primarily engaged in work bearing significantly on Liberty's management or operations since: (a) Defendant asserts the same rationale for finding all NCMs administratively exempt, and (b) the Declarations of Defendant's Rule 30(b)(6) witness show that all NCMs uniformly lack the authority to take any action that may alter the trajectory of care to ultimately reduce costs. The Court, therefore, finds that the first prong of the administrative exemption is susceptible to resolution on a class wide basis.

### b. General Supervision

Plaintiff argues that Class Members were subject to uniform supervisory policies which constituted more than general supervision. (Mot. at 29.) All NCMs have an immediate supervisor: they are all supervised by a direct manager and a second level manager. (30(6)(b) Dep. at 81:8-15.) Defendant's Rule 30(b)(6) witness testified that the ratio of NCMs to their managers is "[t]ypically one to eight." (30b6 Dep. at 56:3-5.) All NCMs are evaluated based on the same standardized criteria and all of these evaluations are done on the same performance review form. (Id. at 118:6-9.) The direct managers apply the same standardized metrics when reviewing all NCMs' work performance. (Id. at 85:7-10.) Direct managers look at "caseload," "referrals," "closures," "billable," and "chargeable time," among others. (Id. at 81:20-25.) All NCMs are required to write their billing hours in a "time tracking" system. (Id. at 22-24.) This time-tracking system involves running "weekly reports" to determine "the last time" the NCM's in-box "was touched." (Id. at 83:10-13.)

While Defendant argues that the record refutes Plaintiffs' allegation that NCMs' work is cookie-cutter or equivalent to an assembly-line in a production environment, Defendant fails to offer evidence contradicting the uniformity of its supervisory policies across the Class. In Liberty's own literature describing the "reporting relationships," the regional managers' role is defined as "supervisory," while the NCMs' role is defined as "technical." (Id. at 92:3-18.) Liberty's job description for the "regional director role" states: "[m]anages and directs the

delivery of department-specific products." (Id. at 80:3-6.) Liberty's witness describes the NCMs as the "product" Liberty's workers' compensation division provides. (Id. at 80:14-16.) Plaintiffs' uncontroverted evidence of stringent and uniform supervisory procedures is sufficient to raise a predominant question common to the class as to the "general supervision" element of the administrative exemption.

### c. Customarily and Regularly Exercises Discretion and Independent Judgment

Plaintiff argues that Class Members' discretion and judgment was not "independent" given the supervisory policies in place over the NCMs. (Mot. at 29.) The administrative exemptions require that the "employee's primary duty ... include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a); see also 8 Cal. Code Regs. § 11040(2)(b). "[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Work must relate to "matters of significance," in contrast to being "clerical" or "routine," or simply involving following well-established procedures found in manuals or similar sources. 29 C.F.R. § 541.202(b), (e). Under California law, the "primary duty" test turns principally on the amount of time the employee spends on exempt versus non-exempt work, and this inquiry must be made on a workweek-by-workweek basis. 8 Cal. Code Reg. § 11040(1)(A)(2)(f). An employee whose primary duty is a combination of exempt duties is also exempt. See 29 C.F.R. § 541.708; Hill v. R + L Carriers, Inc., 690 F. Supp. 2d 1001, 1008 (N.D.Cal.2010) (considering California law).

Defendant argues that there is no way to determine exempt status based on the discretion and independent judgment each NCM exercised in her day-to-day work without relying on "anecdotal testimony to show that, in performing their duties, NCMs in fact exercised little independent judgment and discretion and had no meaningful ability to affect anything of significance." (Opp'n at 27.) The Court disagrees. The Court finds that the issue of whether NCMs regularly exercise discretion and independent judgment can be resolved on a class wide basis without individualized analysis. As discussed, it is undisputed that all NCMs spend 71%, or the majority of their time on the same five tasks. The conclusion by Defendant's expert that there is a lot of variation in the amount of time NCMs spend on particular tasks is relevant only insofar as those tasks allow for the exercise of independent judgment and discretion. On the record presented, in performing these five tasks, it appears that all NCMs uniformly lack discretion to take any affirmative action that could bind others.

Defendant's Rule 30(b)(6) witness testified that in meeting their goal of expediting an employee's return to work by determining what is medically appropriate, NCMs have the authority to use their "clinical judgment" to change an employee's diagnosis. (30b6 Dep. at 40:2-11.) But this "clinical judgment" cannot realistically allow NCMs to exercise varying degrees of discretion on the record presented. Defendant's Rule 30(b)(6) witness testified that the NCMs do not have the authority to override the claims specialist who decides to deny a medication that the NCM believes is medically appropriate in her clinical judgment. (Id. at 44:2-

8.) NCMs cannot even modify or alter the work restrictions stated by the provider. (Id. at 66:13-17.) The NCMs cannot independently order physical therapy or independently alter any prescription. (30(6)(b) Dep. at 68: 10-22.) All the NCMs do is "relay what the diagnosis is." (Id. at 69:11-12.) Defendant's own witness stated that the only difference between an NCM and the job of a registered nurse is "[t]hey're not in the hospital administering treatment." (Id. at 49:13-19.)

Defendant concedes that the only "choice" NCMs have to depart from the standard formula for closing cases is the degree to which they contact providers. (30(6)(b) Dep. at 48:3-7.) But NCMs do not have the authority to discuss their disagreement with the medical provider to the injured worker or to the client and they have no authority to override any information provided by the physician in the injured worker's file. (Id. at 40:4-24, 41:1-4.) It appears that even NCMs' discretion over their communication style is limited. When NCMs want to communicate with any third parties they use "form letters," which they are not permitted to send out unless a provider requests it. (Id. at 71:17-21, 72:1-6.) Furthermore, any remaining discretion NCMs may have in recommending treatment options is cabined by the customer's SSI instructions, disability standards and evidence based medicine guidelines, as well as Defendant's other policies. (Id. at 29-30.) On the evidence presented, NCMs uniformly lack the authority to provide or cut off benefits or modify a diagnosis or alter treatment. (Id.) The degree of discretion NCMs have is therefore susceptible to common proof.

All of Defendants' remaining arguments go to the merits of the discretion and independent judgment prong, which the Court does not consider here. See Stockwell v. City & Cnty. of San Francisco, 749 F.3d 1107, 1113–14 (9th Cir. 2014) ("[T]he district court erred in denying class certification because of its legal error of evaluating merits questions, rather than focusing on whether the questions presented, whether meritorious or not, were common to the members of the putative class."). Defendant essentially argues that one's exempt status turns on how well that employee does its job, not on the nature of the job. In other words, the better outcome the employee achieves, the less likely that employee will receive overtime pay. If the Court accepts Liberty's assertion—that the primary duty of NCMs is uniformly characterized by independent judgment and discretion—then such a fact would weigh in favor of certification.

Since a jury can determine whether the task of "Phone Provider" or "Conducting RN File Review," involves discretion and independent judgment without considering how much time is spent on these tasks, answering this question does not require individualized inquiries. In light of the limited discretion NCMs have to alter the trajectory of their work, the time they spend on each task, or even the mix of tasks required to close each case, Defendant's uniform policies and procedures suggest the NCM's analytical work constitutes common proof for purposes of the administrative exemption. In short, Plaintiffs adequately demonstrate that the issues common to the class can be resolved by common proof predominate over those requiring individualized inquiries. The Court, therefore, finds the predominance requirement satisfied.

**2. Superiority**

Rule 23(b)(3) requires the Court to find "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Considerations pertinent to this finding include:

> (A) the class members′ interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). The superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." Valentino v. Carter–Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996).

The Parties stipulated to consolidating the related cases and there is no other indication that individual Class Members have any interest in individually controlling their cases. Here, the damages suffered by each putative class member are not large, favoring a class proceeding. See Astiana, 291 F.R.D. at 507 ("Where a case involves multiple claims for relatively small individual sums, some plaintiffs may not be able to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").

The Court finds that the proposed action is manageable. The class involves only California employees, making this forum appropriate and desirable. Although manageability issues may arise, none have been identified at this time. A class action is a superior method of resolving the Class Members' claims because it will "achieve economies of time, effort, and expense ... without sacrificing procedural fairness or bringing about other undesirable results." Boyd v. Bank of Am. Corp., 300 F.R.D. 431, 444 (C.D. Cal. 2014) (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 615, (1997)). In conclusion, the Court finds Plaintiff has met the burden of demonstrating that the class satisfy the requirements of Rues 23(a) and 23(b)(3).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for class certification.

**IT IS SO ORDERED.**